Al McCALL, Deceased, Leora McCall
and Sarah McCall, Dependents,
Claimants–Appellants,

v.

McCALL AMUSEMENT, INC.,
Employer–Respondent,

and

Travelers Insurance Company,
Insurer–Respondent.

Leora McCALL, Claimant–Appellant,

v.

McCALL AMUSEMENT, INC.,
Employer–Respondent,

and

Travelers Insurance Company,
Insurer–Respondent.

Nos. 15234, 15235.

Missouri Court of Appeals,
Southern District,
Division Two.

March 1, 1988.

Motion for Rehearing or Transfer
Denied March 23, 1988.

Application to Transfer Denied May 17,
1988.

Bruce K. Kirby, Wear, Keeter, Karchmer, Nelms & Kirby, Springfield, for claimants-appellants.

John G. Newberry, Schroff, Glass & Newberry, P.C., Springfield, for employer-respondent.

FLANIGAN, Judge.

These are consolidated appeals of two claims filed under the Workers' Compensation Law, §§ 287.010–.855.[1] Both claims arise out of a fire which occurred at approximately 3:00 a.m. on August 7, 1983, in an apartment on the premises of the employer, McCall Amusement, Inc. at Branson, Missouri. The fire resulted in serious injuries to claimant Leora McCall and her husband Al McCall. On October 5, 1983, Al died as a result of his injuries. Leora's claim for compensation is based on her personal injuries. The second claim is based on the death of Al, and the claimants are his widow, Leora, and his dependent child.

The claims were tried before James H. Wesley, II, Chief Administrative Law Judge, who entered awards denying both claims. The claimants filed applications for review to the Labor and Industrial Relations Commission which, with one member dissenting, affirmed the awards of the administrative law judge. In its final awards the Commission incorporated the award of the administrative law judge, including his findings of fact and rulings of law. The claimants appeal. The dispositive issues are identical on both appeals.

The claimants assert that the awards of the Commission, which denied compensation, were not supported by sufficient competent evidence because: (a) Al and Leora were required to reside in the apartment adjacent to the business owned by the employer in order to provide security and perform other duties which, by their nature, required that they sleep there, and they were performing such services at the time of their injuries; (b) the awards were based on the ground that the apartment was provided only as a "convenience" to Al and Leora, but under Missouri law acts of convenience incidental to employment are compensable when they provide a mutual benefit to the employer and employee and a

mutual benefit existed here which was created by the living arrangement required by the employer, and Al and Leora were engaged in an act reasonably incidental to their employment when they were injured.

On this appeal this court must determine if each award of the Commission is supported by competent and substantial evidence on the whole record. All of the evidence and legitimate inferences therefrom must be viewed in the light most favorable to the awards. This court may not substitute its judgment for that of the Commission. The awards may be set aside only if there is no substantial and competent evidence to support them or if the findings of the Commission are clearly contrary to the overwhelming weight of the evidence. Conflicts in the evidence are for resolution by the Commission. *Blatter v. Mo. Dept. of Social Services*, 655 S.W.2d 819, 821[1–3] (Mo.App.1983). This court must disregard any evidence which might support a finding different from that of the Commission, and that is true although a finding of the Commission to the contrary would have been supported by the evidence. *Petersen v. Central Pattern Co.*, 562 S.W.2d 153, 155–156 (Mo.App.1978). *Petersen* also holds that the Commission is charged with the responsibility of passing upon the credibility of all witnesses and may disbelieve testimony of a witness even if no contradictory or impeaching evidence appears.

McCall Amusement, Inc., the employer, was the operator of three amusement parks located respectively at Eureka Springs, Arkansas, Rockaway Beach, Missouri, and Branson, Missouri. The corporation had previously operated another amusement park at Lake Ozark, Missouri, but that facility was sold about 1977.

In August 1983, Al was chairman of the board of the small family-held corporation and Leora was president. The other corporate officers were James Langham and Frank Langham, who were Leora's sons by a prior marriage. The attractions at the Branson amusement park included go-carts

1. All references to statutes are to RSMo 1986, V.A.M.S.

and coin-operated machines, and the operations required substantial amounts of available cash.

The only witnesses who testified concerning the employment arrangements and the events of August 7, 1983, were James Langham and Leora McCall, both called as claimants' witnesses.

James Langham testified that he was president of the employer corporation and had succeeded Leora in that office after the fire. The corporation opened the Branson facility in 1973. It was located on Missouri Highway 76, "the strip," where many other tourist attractions were located.

Al and Leora had designed the building, which contained a "live-in apartment." Portions of the building were devoted to "the arcade area," where amusement devices such as coin-operated pinball and video games were located. Also on the premises were a batting range, a bumper car area, a ferris wheel, a merry-go-round, and mechanical rides.

The Branson facility was open from April through October. In October it was open nights and on weekends; in April it was open weekends only. From May 1 until September 30 it was open seven days a week, usually from 10:00 a.m. to around midnight, depending on "the number of people around spending money." During the open hours, a total of 20 to 30 employees worked there, in two shifts.

Al and Leora were, according to Leora, the "managers-owners" at Branson, and they had served in that capacity since 1973. They also maintained a home in Springfield, Greene County, and Al's estate was administered in Greene County. The Springfield home was approximately 40 miles from the Branson facility and it took 40 to 50 minutes to get there.

Some of the employees were ticket sellers-cashiers, trained by Leora. In the morning Leora would "check out" the cashiers' boxes and check them back in at closing. Leora "made sure the money count was correct." During the day Al would supervise the help and do "light maintenance" and Leora would do bookkeeping or conduct job interviews. At closing Leora would tally the cash boxes and put the cash away. It took about an hour to do this and she usually started at 10:00 p.m. Al stayed at the apartment every night during the summer and Leora would be there every night except when she took chemotherapy treatments in Springfield once a month.

Some days ticket sales would run between $3,000 and $4,000, and the coin machines would take in $1,000. Two safes were located in the office and were used for storing money. In the summer of 1983 Leora, who handled the deposits for the Branson facility, made daytime deposits usually twice a week at a bank in Branson. Leora testified that the reason for banking two or three times a week, rather than daily, was mainly for her convenience. Leora testified that at night the cash was put in a safe. "If we did not have room in the safe we would lock the cashiers' boxes in a locked file in the office." At times coins from the machines were kept in the apartment.

On the night of the fire, according to Leora, "Al decided we had too much money in the safe" so Al put $9,000 behind the bedroom door in the apartment. Also in the apartment was $4,000 in coins. The safes in the office contained $10,000 to $15,000.

On the night of the fire, Al went to bed about 11:00 p.m. Leora went to bed about 2:00 a.m. The fire occurred about 3:00 a.m., while Leora was sleeping. Al awoke her and told her there was a fire. Al was "in a panic." The fire was on the east side of the bedroom, "licking at the ceiling." There was smoke in the apartment. Al was trying to open a patio door which had a stick in it to keep it secure. Although badly injured, the two got out of the building. The police came immediately, and Al and Leora were taken to a nearby hospital. James Langham went immediately to the scene of the fire and recovered the $4,000 in coins found in the living area. Most of the $9,000 which was in the money sack in the bedroom was burned.

The building was rebuilt after the fire, and the Branson facility reopened for busi-

ness in 1984. The new building did not contain an apartment. A security alarm system was installed in the new building after two break-ins. There was a less sophisticated security alarm system in the building prior to the fire.

James Langham testified that at the Lake Ozark facility, which the corporation operated until it was sold in 1977, managers were required to live on the premises. On the other hand, at the Rockaway Beach facility and at the Eureka Springs facility, the managers were not required to live upon the premises. None of the other three facilities brought in as much daily income as the Branson facility.

Langham further testified that at the Rockaway Beach facility "we basically locked the premises up.... We relied on local police and the sheriff's department.... The Eureka Springs facility was somewhat more isolated than Branson and the sheriff's department provided service for Eureka Springs." Safes were located in all three facilities for keeping money overnight.

Langham further testified that before the fire "we had a few security problems at Branson, but nothing really major. Once somebody took two go-carts at 2:00 a.m. and Al had to go get them." There was evidence that on this occasion police had discovered the theft of the go-carts and had notified Al of their location. Another time Al found, in a trash can on the premises, a briefcase full of pennies which, perhaps, had been put there by an employee who intended to steal them later.

Langham testified that he was primarily in charge of maintenance at Branson but that Al assisted him, and sometimes this involved work in the early morning hours. Langham said that at the closing of the day's business Al would make sure that everything was locked up and secure. Two nights a week Al would unload coins from the machines. Al had no routine for policing the premises.

Asked the question, "who made the decision for Al and Leora to stay there [at the Branson apartment]," Langham replied, "It must have been a corporate decision. Al and Leora made the decision." Leora testified that the corporate policy of McCall Amusement, Inc. was set "by Al and myself ... it was our policy to have a resident manager on the grounds of the Branson park. I don't remember that we passed a resolution. This was just our way of doing business. We had lots of money at the facilities and we needed someone there to see that the money was protected." She also testified that the apartment was kept ready for use during the winter when the facility was closed.

Leora testified that the Branson apartment was provided by the corporation so that she would have a place to live in Branson and would not have to travel back and forth to Springfield. She testified that the corporation did not provide Al and her with food to be eaten on the premises. She and Al were salaried, with no fixed hours of work. "We were the manager-owners. We were responsible for all [three] locations, 24 hours a day."

The Commission's findings included the following: The Branson apartment was furnished on the basis of convenience as opposed to necessity. A major consideration of Al and Leora in regard to living at the apartment was travel time from Branson to their permanent residence in Springfield. Living in the apartment involved no travel time, but if they commuted between the Branson facility and their Springfield home, the trips would be made between 2:00 to 3:00 a.m. and 8:00 to 9:00 a.m. "The employer and employee are the same person from a practical point of view (as opposed to a legal point of view)" and once Al and Leora decided to stay in the apartment they did not have to secure permission from the employer because they were the employer. When the facility was rebuilt it did not have a live-in apartment. Prior to the fire the apartment was not vacant during the winter months when the park was closed. "The choice of living there now becomes a personal choice as opposed to a business choice." Leora testified that cash on hand was deposited on the basis of convenience or that if "too much" money accumulated a deposit would be

made. "It was a convenience factor that precipitated most of the deposits. If the accumulation of a large sum of money was a true concern, then some arrangement could have been made to make daily or regular deposits so as to avoid the accumulation of a large sum of money; and if the amount of cash kept on the premises overnight was a true concern (security), then a deposit could be made after the park closed."

The Commission also said: "[W]here the employee lives on the premises as a result of convenience as opposed to necessity, any injuries sustained must have some real relationship to the employment, i.e., while investigating the source of a disturbance on the premises. If the injury results from personal consideration, i.e., sleeping in connection with a fire of unknown origin, then the injury is strictly personal and not job related, and accordingly, it does not arise out of and in the course of the employment." Finally the Commission said that assuming, arguendo, the apartment was provided on the basis of necessity, the injury must relate to and arise from a job-related occurrence, and that there was no causal relationship between the fire and the employment.

The Commission cited *Fingers v. Mount Tabor United Church of Christ*, 439 S.W. 2d 241 (Mo.App.1969) in support of its ruling. The excellent briefs of both sides cite, in support of their respective positions, *Morgan v. Duncan*, 361 Mo. 683, 236 S.W.2d 281 (1951), and *Fingers*.

In *Morgan,* a hotel clerk brought a lawsuit against her employer seeking to set aside an order of the Workmen's Compensation Commission approving a compromise settlement of her claim. She was required to live in the hotel and she was injured on the hotel elevator when leaving the premises to go to the grocery store. The court held that the plaintiff failed to sustain her burden of showing fraud in the procurement of the Commission's order, and that the settlement barred her common law action for damages.

The court said, at p. 283, 361 Mo. 683:

"[A]n injury to an employee living, boarding, or lodging on the employer's premises, or at the place where the work is being done, pursuant to an *express* or *implied requirement* of the contract of hiring, if reasonably attributable or incidental to the nature of employment, or to the conditions under which he lives in the performance of his duties, is to be regarded as having arisen out of and in the course of such employment. On the other hand, the mere fact that an employee was living on the employer's premises at the time of injury does not ordinarily, of itself, render such injury compensable as arising out of or in the course of the employment where such residence on the employer's premises is merely *permissive* and not required, or where the injury results from a risk or danger which is not reasonably incidental to the employment. . . .

"It may thus be seen that in the circumstances of some cases, where the ultimate question of compensability under the Workmen's Compensation Law is presented, a supporting issue as to the *requirement* of the employee's residence may be determinative." (Emphasis added.)

In *Fingers,* the court affirmed an award denying workmen's compensation benefits to the claimant, a church custodian who was required to live on the employer's premises. At the time of the injury the claimant was walking down the steps to his basement for the purpose of selecting a place to store his old refrigerator which was being replaced by a new one. The court set forth the foregoing quotation from *Morgan.* Referring to the last sentence in that quotation, the court said, at pp. 244–245:

"We construe that comment to mean that the fact that an employee is required by the terms of his employment to live on his employer's premises and is injured thereon is *one* factor, *but only one*, in the determination of whether the employee's accidental injury arose out of and in the course of his employment. To contend it is the sole fact is to argue that merely because the employee is required

to live on the premises and is injured thereon, regardless of the other facts and circumstances under which the injury occurred, is tantamount to making such an employer an insurer of his employee. Our Workmen's Compensation Law was never designed to operate as accident insurance with blanket coverage as to any and all accidents wherever and whenever received by an employee.... Nor have our appellate courts as yet reached the point where they hold that it necessarily and inevitably follows that an employee is entitled to compensation in every case merely because his injury or death occurred on the employer's premises." (Emphasis in original.)

At p. 245 the court said:

"[W]e cannot accept the view that all activities of an employee who is not actually on duty, no matter how personal they may be, are within the scope of his employment merely because he is required to live on the employer's premises and is subject to call. In the instant case the claimant had completed his work for the day, and while he was subject to call in an emergency, he was in fact off duty when he was injured."

The court pointed out that the occurrence giving rise to the claimant's injury was "a purely personal one" and was "entirely disassociated from the work which he had been hired to perform." The court also said, at p. 246:

"While owned and furnished by the employer the house was claimant's home, occupied solely by him and his family, as much so as if he had rented quarters elsewhere. There was no special risk or hazard incident to the employer's house in which the claimant was required to live and the personal activity which occasioned his injury was not incidental to his employment. Under the circumstances of this case we are of the opinion and hold that claimant's injuries did not arise out of and in the course of his employment."

In both *Morgan* and *Fingers*, the employee was required to live on the premises. In *Morgan* the employee was injured while in the act of leaving the premises on a personal mission. In *Fingers* the employee was injured while engaged in a purely personal activity. In *Morgan* a finding of compensability would have been proper, and in *Fingers* a denial of compensability was affirmed.

The burden of proof was on the claimants to show that Al's death and Leora's injuries, respectively, resulted from an accident "arising out of and in the course of his employment." § 287.120.1. Generally speaking, an injury arises "out of" the employment if it is a natural and reasonable incident thereof and is the rational consequence of some hazard connected with the employment. An injury arises "in the course of" the employment when it occurs within the period of employment, at a place where the employee may reasonably be and while he is reasonably fulfilling the duties of his employment. There is no "all embracing definition" of the phrase "arising out of and in the course of his employment," and each case must be decided on its own facts and circumstances and not by reference to some formula.[2]

■ The issue of compensability is governed by the nature of the employee's activity at the time of the injury itself. It is not sufficient that the employment may simply have furnished an occasion for an injury from some unconnected source. Missouri has rejected the so-called "positional-risk theory" under which an accident becomes compensable on a mere showing that it would not have happened but for the fact that the conditions or obligations of the employment put claimant in the position where he was injured. It is not sufficient that the claimant's employment caused him to be at the place where it happened.

■ A claim is not compensable if, at the time of the injury, the employee is engaged in "pleasure purely his own." On the other hand, an injury suffered by an employee

**2.** Each of the propositions set forth in the above paragraph and the two paragraphs following it is supported by authorities cited in *Blatter v.*

*Mo. Dept. of Social Services,* 655 S.W.2d 819, 823–824 (Mo.App.1983).

while performing an act for the mutual benefit of the employer and the employee is usually compensable and arises out of and in the course of the employment, even though the advantage to the employer is slight. The mutual benefit principle, however, cannot be applied without limitation because eventually the indirect benefit to the employer becomes so tenuous as to be imperceptible.

Authorities dealing with the compensability of injuries sustained by an employee while living on the employer's premises, either pursuant to an express or implied requirement of the employer or merely with the permission of the latter, include Larson's Workmen's Compensation Law, Vol. 1A, §§ 24.00–.40; 99 C.J.S. Work. Comp., § 230b, p. 782; 82 Am.Jur.2d Work. Comp., § 248, p. 35; 31 A.L.R. 1251 (Injury to employee who lives on employer's premises as arising out of and in the course of employment); supp. 56 A.L.R. 512, 158 A.L.R. 607.

■ The foregoing authorities agree that a crucial factor affecting compensability is whether the employee's residing on the premises is required or merely permitted. According to Larson, § 24.00, if the residence is required and the employee is continuously on call, whether or not actually on duty, the entire period of his presence on the premises is included in the course of employment. If, however, he has fixed hours of work outside of which he is not on call, compensability usually hinges on whether the source of injury was a risk associated with the conditions under which he lived because of the requirement of remaining on the premises. When residence on the premises is permitted but not required, "the employee is free to do as he pleases and there is no continuity of employment obligation of any kind during the time the employee is voluntarily sleeping in a place provided for his convenience by the employer." Larson, 24.40. According to C.J.S., supra, "The test is whether or not the workman is given a choice in the matter and is free to come or go as he pleases; if he is, injury is not compensable, but if he is not, it is."

■ This is a close case factually, as demonstrated by the split decision of the Commission. Commissioner Fowler, who dissented, was of the opinion that the evidence showed that Al and Leora were required to live in the Branson apartment. It is clear that if the Commission had so found, that finding would have had evidentiary support. On the other hand, the other commissioners found that Al and Leora resided on the premises merely with the permission of the employer and not as a matter of express or implied requirement. The various evidentiary factors enumerated by the Commission in support of that finding do in fact serve to do so.

Of the three amusement parks operated by the employer in 1983, only Branson had "live-in managers." After the fire, even Branson had no live-in manager. Although claimants argue that Al and Leora were required to live in the apartment as a matter of security, there was evidence that there were no "really major" security problems, and the nighttime incident involving the taking of the go-carts was something discovered by the police and not by Al. The handling of the cash and the scheduling of the deposits was a matter, at least so the Commission could and did find, dictated by the personal convenience of Al and Leora.

The issue of whether Al and Leora's residing on the premises was required or merely permitted by the employer was a factual one. Under authorities cited earlier in this opinion, this court may not substitute its judgment for that of the Commission and may set aside the awards only if there is no substantial or competent evidence to support them or if the findings of the Commission are clearly contrary to the overwhelming weight of the evidence. The Commission's finding on the "required-permitted" issue does not run afoul of those criteria.

There was no evidence showing the cause or point of origin of the fire. There was no showing, and no claim is made on these appeals, that the employer's premises created a greater risk of fire than that to which claimants would have been exposed if they had slept at home. Leora was asleep when the fire started and Al had preceded her to bed. It is a reasonable, if

not inescapable, inference that Al himself was awakened by the fire only moments before he awoke Leora. At that time, so the Commission could properly find, neither of them was engaged in any activity advancing the interest of the employer.

It is not sufficient for reversal that a finding of the Commission in favor of the claimants would have been supported by the evidence. This court holds that findings of the Commission are supported by competent and substantial evidence and are not contrary to the overwhelming weight of the evidence.

With respect to each claim, the final award denying compensation is affirmed.

PREWITT, P.J., and MAUS, J., concur.

HOGAN, J., not participating.